## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | Chapter 11 |
| **SPACE CASE (f/k/a Masten Space Systems, Inc.),** | Case No. 22-10657 (BLS) |
| **Debtor.** | |
| **PETER HURWITZ, as Liquidating Trustee of the Masten Space Systems, Inc. Liquidating Trust,** | |
| **Plaintiff,** | |
| **v.** | Adv. Proc. No. 23-_____ (BLS) |
| **SEAN MAHONEY, individually; MATTHEW KUHNS, individually; and COLIN AKE, individually,** | |
| **Defendants.** | |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

Peter Hurwitz, as Liquidating Trustee ("Plaintiff") of the Masten Space Systems, Inc. Liquidating Trust established pursuant to the Court's *Findings of Fact and Conclusions of Law (I) Approving Disclosure Statement on a Final Basis; and (II) Confirming Modified Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Masten Space Systems, Inc. Dated November 1, 2022* [Main Case ECF No. 226], alleges the following against SEAN MAHONEY ("Mahoney"), MATTHEW KUHNS ("Kuhns"), and COLIN AKE ("Ake," and together with Mahoney and Kuhns, the "Defendants"), and states:

## I.  PRELIMINARY STATEMENT

1.      This is an action for damages brought against the Defendants, each of whom is a former officer of Masten Space Systems, Inc. (the "Debtor"), for breaches of their fiduciary duties owed to the Debtor and its creditors, or alternatively, for aiding and abetting breaches of fiduciary duties.

2.      Mahoney, former Chief Executive Officer ("CEO") of the Debtor, dreamt of taking Masten to the moon, but his dream was doomed from the start.  Mahoney never formulated an actual plan for this growth, ignored the advice and counsel of those around him, and failed to ensure the company had even the basic foundations needed to make his dream a reality.  Despite these obvious deficiencies, the Defendants continued to take the company down a path that led to its ultimate demise, causing unnecessary harm to the company's creditors along the way.

3.      The Defendants positioned Masten to secure the company's largest ever contract with NASA – the MM1 Mission (defined below) – a project that, if successful, would have put Masten on the forefront for similar projects with NASA in the future.  However, under Mahoney's direction, Masten recklessly and severely underbid the MM1 Mission.  The bid, among other things, failed to account for the company's utter absence of infrastructure, staffing, expertise, and plans to successfully complete the project.  From the outset, Mahoney knew the costs of the MM1 Mission would exceed the bid revenue from NASA, but Masten told NASA the company intended to make up the shortfall with commercial contracts it had not then secured, and ultimately never would.  And even later, when Masten had the opportunity to request supplemental funding from NASA to make up for overages and delays related to the Covid-19 pandemic, Mahoney flatly ignored the counsel of Masten's employees with more knowledge on the matter and proceeded with an outlandish request that ultimately irreparably damaged the company's relationship with

NASA – nor was this the first time Mahoney ignored counsel from Masten employees with knowledge and expertise, and went rogue on an issue of importance to the company.

4.      When those commercial contracts did not come to fruition, the Defendants doubled down and bid on *even more* NASA contracts that Masten could not fulfill, in hopes that those new contracts would generate additional cash flow to financially support the MM1 Mission contract – despite the fact that Masten did not have the workforce or resources to complete the contracts it already had been awarded.  The Defendants used this strategy to keep Masten afloat for a short time, but with no plan to fix the underlying problems.  During this time, Masten fell deeper and deeper in debt, thereby causing substantial harm to the company's enterprise value, business relationships, employees, and creditors.

5.      Despite his starry-eyed ambition, Mahoney set the Debtor up for failure.  Indeed, Mahoney approached problem-solving at Masten with what he dubbed the "bacon cheeseburger approach" – making quick and uninformed decisions without first evaluating or even considering alternative solutions.  Unfortunately, Mahoney's philosophy caused significant damage to Masten, leaving the company hopelessly insolvent and utterly unable to fulfill its obligations to NASA and other creditors.  As it turns out, you cannot fly a bacon cheeseburger to the moon.

6.      As discussed more fully below, Ake and Kuhns, former Vice Presidents of the Debtor, knew about Masten's significant issues, including understaffing, inadequate facilities, lack of formality, concerns expressed by employees, and, importantly, the company's inability to fulfill its obligations on the MM1 Mission and other NASA contracts without additional contracts to offset the expected losses.

7.      Ake and Kuhns failed to formulate and/or implement plans to address these problems, and failed to report the issues to the Debtor's board of directors (the "Board") despite

their fiduciary duties to do so.  Ake and Kuhns were well aware of the problems, and occasionally discussed them with Mahoney, but they never formulated a plan to address them, leaving Masten and its creditors to suffer the consequences.

8.      As set forth herein, each of the Defendants breached their respective fiduciary duties by, among other things: (a) securing the MM1 Mission with NASA at unreasonably low pricing and without the infrastructure, staffing, or plans necessary to fulfill Masten's obligations; (b) securing additional NASA contracts in an attempt to bolster cash flow to support the MM1 Mission, without having the ability to fulfill those additional contracts; (c) failing to impose corporate safeguards and controls over the Debtor's financial and operational affairs, causing significant losses to the Debtor's enterprise value; (d) burdening the Debtor with additional expenses and debt after the Debtor was already hopelessly insolvent; (e) failing to oversee or hire competent individuals to manage and perform under the Debtor's contracts; and (f) failing to establish information systems sufficient to identify red flags and overcome harmful corporate governance issues.

9.      As a direct and proximate result of the actions or omissions of the Defendants, the Debtor incurred millions of dollars in damages in the form of lost revenue, increased insolvency, lost enterprise value, unnecessary proliferation of creditor claims, and administrative expenses incurred in the Debtor's bankruptcy case.

## II.  PARTIES, JURISDICTION, AND VENUE

10.      On July 28, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

11.      On November 9, 2022, the Court entered its *Findings of Fact and Conclusions of Law (I) Approving Disclosure Statement on a Final Basis; and (II) Confirming Modified Combined*

*Disclosure Statement and Chapter 11 Plan of Liquidation of Masten Space Systems, Inc. Dated November 1, 2022* [Main Case ECF No. 226], appointing Plaintiff as the Liquidating Trustee of the Masten Space Systems, Inc. Liquidating Trust.

12.     Prior to the Petition Date, the Debtor was a Delaware corporation with its principal place of business in Mojave, California.

13.     Defendant Mahoney served as the Debtor's CEO from 2013 until April 2022.

14.     Defendant Kuhns served as the Debtor's Vice President of Research and Development from October 2020 to May 2022, although he was employed by Masten in various other capacities for many years prior.

15.     Defendant Ake served as the Debtor's Vice President of Lunar Development[1] from May 2020 to June 2022.

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334; 28 U.S.C. §§ 157(a), (b)(2)(A), and (b)(2)(O); and Federal Rule of Bankruptcy Procedure 7001.  Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409(d), as the Debtor was organized under the laws of Delaware.

17.      Pursuant to Local Bankruptcy Rule 7008-1, Plaintiff states that it consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## III.  FACTS SUPPORTING CLAIMS

### A. Background

---

[1] Ake was also referred to at times as the Vice President Strategy and Business Development.

18.     The Debtor was founded in 2004 with the purpose of reducing the barriers to space by making rockets and spacecraft more cost effective through the use of reusable technologies, autonomous systems, and small operational teams.  The Debtor was incorporated as a Delaware corporation on February 1, 2005.

19.     In 2006, Masten relocated its headquarters from its original location in Santa Clara, California, to the Mojave Air and Space Port in Mojave, California.

20.     At all relevant times, the Defendants held themselves out to be officers of Masten. Still, they only first formalized those positions in 2017 with respect to Mahoney, and in 2021 with respect to Kuhns and Ake, when Masten's Board resolved by unanimous consent to appoint official officers of the company, retroactive to 2010 and 2020, respectively.

21.     Pursuant to the 2021 unanimous consent, Mahoney, as CEO, had general supervision, direction, and control of the business and the officers of Masten.  Both prior to and following the Board's official appointment, Mahoney operated at the helm of Masten and exercised largely unchecked authority to make the majority of the company's decisions.

22.     Mahoney's involvement in communications with customers (including NASA), resulted in a loss of confidence in Masten generally, and specifically the company's abilities to perform under various contracts.

23.     Mahoney was also difficult to work with and was not willing to provide the structure and support a rapidly growing aerospace company needed.  Rather than fostering an environment of collaboration and teamwork, Mahoney created an unstable work environment that lacked organizational structure, fostered uncertainty, and sidelined employees, some of whom feared retaliation when they voiced concerns.  This unstable environment made it more difficult for Masten to fill roles needed to support the company's work for NASA and other customers.  As

a result, many key roles were left vacant or staffed with under-qualified individuals and, even then, only when Mahoney determined it was appropriate.

24.     Throughout his tenure, Mahoney eschewed formality, job titles, and job descriptions, at least internally.  For most of Masten's existence, this was fine because Masten was a small company with fewer than 25 employees, during which time operating informally appeared to suffice.

25.     However, beginning in 2020, the Defendants grew the company rapidly in an effort to support its contracts with NASA.  By 2022, the company had mushroomed to 104 employees. Still, Masten lacked the necessary corporate structure to keep up with the company's growing workforce.  Mahoney, with Kuhns and Ake's acquiescence and similar failure to act, failed to create or implement structure or managerial processes necessary for a larger company working on larger government contracts and growing rapidly.

**B.  The MM1 Mission**

26.     For its entire history up to the bankruptcy filing, Masten primarily funded its operations using the revenue generated from government and commercial contracts, and investments from a small group of investors and shareholders.

27.     This approach to financing operations was sufficient to support a small business with around two dozen employees.  But it was woefully inadequate to support the level of services required for the major NASA contract Masten ultimately bid on and was eventually awarded.

*(1) Mahoney Caused Masten to Underbid MM1 Mission Knowing it Would Result in Substantial Losses*

28.     In 2019, after working for years with NASA on a number of smaller contracts, Masten was awarded commercial lunar payload services ("CLPS") provider status by NASA.

NASA grants the CLPS designation only to companies that have met certain criteria to be pre-qualified to bid on specific projects.

29.    As a result of its CLPS status, in 2020, Masten had its first opportunity to bid for an extensive NASA project that would span several years and bring the company to the forefront of the industry.  Through this project, NASA requested to have eight payloads of science and technology instruments delivered to the Lunar South Pole with a soft landing on or before December 31, 2022 (the "MM1 Mission").

30.    With Mahoney's approval, Masten submitted a bid of $79.5 million.  This bid was far less than the amount bid by Masten's competitors, and far less than the actual costs necessary to meet the requirements of the project.  The Defendants justified the bid deficiency with the unsupported assumption that Masten would secure private commercial payloads to defray the project's costs.

31.    In March 2020, at the time Masten submitted its MM1 Mission bid, Mahoney wrongly assumed Masten could secure an agreement with a commercial customer to fly its payload to the moon at a price that would have covered the shortfall in the proposal.  However, Masten had no binding commitment and nothing in writing with this, or *any*, commercial customer.  Mahoney had no reasonable basis to make such an assumption.  Indeed, the single *potential* commercial payload customer Masten had identified for the MM1 Mission would later contract with another CLPS provider, leaving Masten with a large financial hole in the overall expense of the MM1 Mission – a hole that Masten would never be able to fill.

32.    Masten was ultimately the winning bidder for the MM1 Mission.  Central to the MM1 Mission, Masten was to design, build, and deliver the spacecraft to NASA; arrange launch services; and operate the lunar lander throughout the mission.  Masten's XL-1 lander was expected to be the first mission to softly land at one of the moon's poles.  At the time of the award, however,

Masten did not have any employees capable of building spacecraft. Masten also did not have the appropriate facilities in which to build them. Nor, as it turned out, did Mahoney have a plan for how Masten would overcome these obvious deficiencies.

33.    Part of the "strategy" behind Masten's exceptionally low bid on the MM1 Mission was to put Masten in a position of obtaining future NASA contracts for future payload deliveries. NASA had already allocated $2.6 billion to such deliveries over the next 10 years. However, future contracts depended on a successful completion of the MM1 Mission, and unfortunately, the Defendants caused Masten to overpromise and underdeliver and ultimately lose out on that future revenue.

34.    Masten should have been able to secure the needed investments to cover these anticipated growth opportunities. Indeed, at that time, Masten's competitors in the aerospace industry were securing major investments. However, with Mahoney at the helm, Masten was unable to secure similar (and necessary) investments in part because Masten lacked reliable financial information: it had no projections, disorganized financials, and nothing close to an investor deck, all of which would have been necessary to secure such investments.

35.    In fact, at year end 2020, just a few months after the MM1 Mission award, Masten was operating at an $11 million loss, $9 million of which was directly related to the MM1 Mission, even though the project had been projected to provide 80% of Masten's revenues in 2020 and 2021.

36.    The timing of the MM1 Mission was critical for NASA. This was a high-profile project for NASA and the first of its kind anticipated to have a soft landing on the lunar pole. Additionally, because of where the MM1 was to land, the time window in which the mission could

land was very short – approximately November to January, and any delay outside of that window would push the entire project back at least a year.

37.     The Defendants were acutely aware of the importance of the landing window, but by March 2021, one year into the MM1 Mission, Masten was so far behind schedule it requested a one-year extension of the deadline to complete the mission.  NASA begrudgingly agreed to the extension when it became clear there was no way that the original timeline was achievable by Masten.

38.     Despite obtaining this year extension, the Defendants still had no plans for how to meet the MM1's objectives.  Indeed, they sought the extension without creating a plan for how to get to the moon, even with extra time.

39.     Additionally, the extension resulted in significant increases to the Mission's budget.  And despite seeking the extension from NASA, the Defendants had no plan to cover the extra year of expenses.

40.     Despite the glaring hole, the Defendants continued to dig.  They continued working on the MM1 Mission unabated and without a plan to fix the massive problems in the project, even though it was driving Masten further into insolvency.  Due to their operational incompetence, the Defendants' deficient efforts only exacerbated the harm to the MM1 Mission, and caused Masten to lose out on future opportunities.

*(2)* *Defendants Knew Masten Lacked Resources Necessary to Complete the MM1 Mission*

41.     The MM1 Mission was by far the largest program in Masten's history.  At the time it was awarded, Mahoney knew or should have known that the company lacked both the organizational and the physical infrastructure to support the program.

42.     At the time of the award in April 2020, the Debtor occupied just a few buildings at the Mojave Air and Space Port that lacked vital facilities to fulfill the project obligations. Specifically, Masten had no clean room facilities, no facilities for supporting space mission operations, and importantly, no facilities appropriate for assembling a spacecraft.

43.     At that time Masten had only 14 employees and not one of them had experience building or even operating the spacecraft Masten was now contracted to build, launch, and operate throughout the mission.  The Debtor also had few, if any, employees with managerial experience equipped to manage the size of the workforce Masten would need for the MM1 Mission.

44.     When the MM1 Mission was awarded, and as Kuhns and Ake took on their Vice President roles, the Defendants knew that Masten would have to quickly scale up its workforce and facilities by multiples, but the Defendants failed to formulate a plan to overcome these deficiencies.

45.     Even prior to making the proposal to NASA and prior to taking on the role of Vice President, in 2019 Kuhns shared in a team presentation that Masten would need to significantly increase funding to sufficiently staff a successful lunar landing, however he did nothing to secure such funding.

46.     By May 2021, little more than a year into the project, Mahoney recognized Masten would never reach the target launch date of December 2022 under the MM1 Mission timeline.  As discussed above, although the Defendants specifically sought out and requested the extension – which they knew would cause an increase in Masten's project expenses given the need to cover overhead for an additional year or more – they failed to devise a plan to meet those increased financial obligations, either before or after obtaining the extension.  Accordingly, even with the

extension, Masten was no more likely to meet the MM1 Mission's requirements than it was under the original deadline, and extending the deadline pushed Masten further into debt.

47.      The unplanned and increased expenses materially impacted Masten's bottom line, because the company had already been operating at a loss with liabilities exceeding assets.  The Defendants knew or should have known that extending the timeline would increase Masten's expenses, and plan for how to address those increased expenses, rather than simply driving the company further into insolvency.

48.      In July 2021, Kuhns and Ake prepared a presentation to Masten's Board regarding the status of the MM1 Mission.  Although Kuhns and Ake plainly knew the company was still understaffed, they failed to offer a plan to correct the staffing issues – either at that time, or at any point thereafter.  Indeed, Kuhns and Ake acknowledge in the presentation that the staffing problem was driven by low salary ranges, a need for high competency levels, and the relocation to Mojave. Each of these issues was imminently fixable, a direct result of decisions made by the Defendants, and ultimately within their authority to correct.

49.      In August 2021, after receiving the extension from NASA that the Defendants failed to plan how the company would cover the increased expenses (and yet still understaffed in key roles on the MM1 Mission), Masten's Chief Financial Officer ("CFO") advised Mahoney that the company was six months away from running out of cash and needed to implement an immediate hiring freeze until the company was able to raise additional capital.  Despite this, the Defendants took no action to raise money, cut costs, or otherwise address the funding hole, ultimately resulting in Masten's bankruptcy filing the following year.

C. **Masten's Financial Situation Spiraled While Defendants Spent Money Expanding Office Space Instead of Fulfilling Critical Needs**

50.     In 2021, Masten desperately needed the Defendants to focus on the company's staffing and improving operating facilities in Mojave to meet the needs of the MM1 Mission. Yet, instead of addressing these critical needs or securing the financing needed to support the MM1 Mission, Mahoney and Ake were instead focused on increasing Masten's footprint across the country.

51.     In March 2021, in the midst of planning the Atlanta offices, engineers on site at Masten's facility in Mojave notified Mahoney about significant issues with the clean room that was then being built. If not corrected, the engineers on site warned the issues would lead to an inability to properly serve Masten's customers and severe reputational damage.

52.     At that time, however, instead of focusing on the needs of the MM1 Mission, and the clean room problems, Mahoney and Ake diverted their attention and Masten's limited resources to developing an Atlanta office, where the lease alone was budgeted at $75-135,000 annually. The space, however, was totally unnecessary at the time because there was only a small team working in Atlanta, and they were already mostly working remote. While most other companies were reducing their footprint, Ake believed the Atlanta-based team would grow and *might* eventually need the space.

53.     Mahoney, who was located in Georgia, was also deeply involved in the Atlanta office plans. It was Mahoney's vision that the Atlanta office would be a "physical manifestation of the collegiality and [Masten's] forward thinking," and would include unnecessary luxury features.

54.     By December 2021, Masten had to implement a spending freeze (in addition to the hiring freeze implemented in August 2021), as Masten ran out of cash.

55.     At this time, Masten began failing to timely make payments to various vendors citing a delay in receipt of payments from NASA, even though the payment delays were due to Masten's failure to timely make milestone deliveries to NASA, which included, among others, missing a $4.6 million installment payment due to SpaceX on December 1, 2021; and missing a $1.7 million progress payment to Agile Space Industries that was due on or before November 14, 2021.[2]

56.     As a result, vendors who were contributing to the MM1 Mission began pulling out of the project, leaving Masten with few options to salvage any revenue from the contract.

57.     All of these defaults were the direct result of the Defendants' failure to adequately plan for or to effectuate any reasonable plan to meet the requirements of the MM1 Mission. Nevertheless, at this critical juncture, the Defendants had yet another opportunity to obtain additional funding from NASA.

**D.  Mahoney Tanks NASA's Confidence in Masten**

58.     As 2021 drew to a close, despite the aforementioned deficiencies, NASA continued to work with Masten.

59.     To address potential shortfalls directly related to the Covid-19 pandemic (and related delays and supply chain issues), NASA invited Masten to apply for Covid relief funds. Masten desperately needed the money, and by then the need was urgent.

60.     Mahoney was cautioned by Masten employees with knowledge of both the MM1 Mission and NASA's expectations to keep the request to no more than $1-1.3 million to obtain rapid approval and funding.

---

[2] Agile Space Industries brought suit against Masten in the Superior Court of Delaware for the missed payment, which suit resulted in the entry of a stipulated judgment in the amount of $770,000 just days before the bankruptcy filing.

61.     The Covid relief money, and certain invoice payments which were linked, were desperately needed for payments due to crucial suppliers at year end.  Mahoney was strongly cautioned that exceeding the suggested range would not only risk denial and delay the funding, but would also potentially jeopardize NASA's confidence in Masten's management of the MM1 Mission.

62.     Instead of heeding this advice, Mahoney submitted an outlandish $17.4 million request in late November 2021, without providing any detail to support the amount requested.  As expected, NASA denied the request the same day it was submitted.

63.     This single decision by Mahoney, in the face of advice to the contrary, caused Masten to default on material obligations from which the company would never recover.

64.     As a result, NASA lost confidence in Mahoney and his ability to spearhead Masten's completion of the MM1 Mission or any future projects.  In fact, NASA representatives specifically requested that Mahoney be removed from all future communications with NASA.

65.     Although Masten later resubmitted (and was granted) additional Covid funding of just under $1 million in early 2022, by then critical vendors already defaulted Masten and the damage done to Masten's relationship with NASA by Mahoney's excessive, unreasonable, and unsubstantiated request was irreparable.

**E.  Lack of Organizational Structure Caused Company-Wide Failures**

66.     As discussed above, and as a result of Mahoney's actions, or inactions as the case may be, Masten found itself in a dire financial position.  Those problems were exacerbated by Mahoney's insistence that Masten be run informally, with a flat organizational structure that fostered uncertainty and a lack of oversight.  Mahoney refused to create an organizational chart or define roles even when asked to do so by others within the company.  Worse, the lack of defined

roles caused critical decisions to be funneled exclusively to Mahoney, who was often indecisive, resulting in bottlenecks.

67.    Mahoney refused to invest in critical positions, leaving inexperienced or underqualified employees in positions of authority.  Mahoney also set unrealistic expectations for internally communicating information throughout the company – instead, sharing information on what he deemed was a "need to know" basis.

68.    Exhibiting a lack of focus, business strategy, and professionalism in his capacity as CEO, Mahoney used a strategy he dubbed the "bacon cheeseburger approach" to come up with bare minimum solutions to symptoms of systemic problems.  These were "just good enough" to address immediately urgent issues at Masten, without addressing the cause of the problem or finding actual, reasonable solutions.  In describing this approach, Mahoney stated that employees should select and accept a "bacon cheeseburger solution" that was "good enough" even before considering better options.  This philosophy was deployed throughout the organization, from the top down, and repeated over a variety of decisions.  It was disastrous for Masten as evidenced by the Defendants' failure to: (i) make any meaningful plans to meet the MM1 Mission requirements; (ii) strategically and thoughtfully ramp up company expansion after award of the contract; (iii) fill the gaping financial hole in the MM1 Mission funding; and (iv) actually plan for and send the required spacecraft to the moon.

69.    Masten lacked structure, or any corporate policies and procedures, because Mahoney preferred this more "casual" culture.  As a result of poorly defined structure and roles among employees and independent contractors, there was a great deal of confusion regarding the company hierarchy, chain of reporting, and general duties and job functions.

70.     Between 2020 and 2021, the Defendants were made aware of several formal complaints by employees, but failed to implement changes to the corporate structure or culture that could have reduced the risk of additional claims against the company.  Indeed, during this time, at least one employee brought a formal complaint against the company for retaliation when the employee was fired after alerting Mahoney and Ake to potential billing irregularities by Masten.  Finally, in late 2021, more than a year after the award of the MM1 Mission, and upon the insistence of general counsel and others, Mahoney allowed Masten to formally document general human resource policies and a basic organizational chart.

71.     In January 2022, Masten's CFO and General Counsel continued working on building an organizational chart, with a focus on ensuring the "home chart" complied with Department of Labor regulations.

72.     Masten's CFO and General Counsel advised Mahoney that the company's use of independent contractors violated Department of Labor rules.  They suggested that the positions should be fundamentally reviewed, reevaluated, and removed from the draft organizational chart. While both the CFO and General Counsel strongly advised Mahoney that independent contractors should not be treated as employees, Mahoney ignored their counsel and said he was willing to "bear the risk" of including independent contractors in the company's organizational chart.  Instead of making an informed decision or even attempting to understand the risks to which he was exposing the company, Mahoney suggested creating a second organizational chart – one without independent contractors for use outside of the company, and a second one with the contractors listed for internal use.

73.     Around the same time, the Board directed Mahoney to step down as CEO.  In April 2022, the Board formally removed Mahoney.

74.    Just prior to filing bankruptcy, Masten made a "hail Mary" attempt to secure investments or a buyer to save the company, but it was too little too late.  Although Mahoney had already been ousted, his reckless disregard for the future of the company left Masten in a position where a bankruptcy filing was unavoidable.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### *(Against Mahoney, Kuhns, Ake)*

75.    Plaintiff re-alleges paragraphs 1 through 73 as if fully set forth herein.

76.    At all times material hereto, Mahoney, Kuhns, and Ake were officers of the Debtor. As such, the Defendants owed the Debtor and its creditors fiduciary duties, including the duty of care and the duty of loyalty.

77.    The Defendants had an obligation to discharge their duties in good faith with the care an ordinarily prudent officer in a like position would exercise, in a manner reasonably believed to be in the best interests of the Debtor and its creditors, and to consider all material information reasonably available in making business decisions.

78.    The Defendants exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtor and its creditors.

79.    The Defendants breached their fiduciary duties owed to the Debtor and its creditors by, among other acts or omissions, the following:

    a.    Failing to properly plan for, oversee, or comprehend the scope of the work required by the MM1 Mission;

    b.    Refusing to invest in key positions resulting in inexperienced or underqualified employees in positions of authority;

c.  Failing to plan for a trained and/or skilled workforce to operate and maintain the MM1 Mission;

d.  Failing to focus efforts and resources singularly at the critical facility needs at the Mojave location;

e.  Failing to negotiate realistic financial terms of the MM1 Mission which would have allowed Masten to cover the expenses for and realize a profit on the project;

f.  Failing to secure commercial payload contracts or investments to offset the loss of the MM1 Mission;

g.  Failing to heed advice when submitting a request for over $17 million in Covid relief funds from NASA, causing unnecessary delays in critical funds and irreparably harming the relationship between Masten and NASA;

h.  Failing to implement an organizational structure or culture required by a company handling large government contracts;

i.  Failing to keep themselves apprised of concerns and allegations made by various employees and make changes necessary to alleviate such concerns; and

j.  Continuing to operate the Debtor once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors.

80.  The acts and omissions of the Defendants were adverse to the best interests of the Debtor and its creditors, and were neither intended to confer nor conferred any benefit upon the Debtor.

81.  As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Debtor's creditors have tens of millions of dollars in unpaid claims against the Debtor's bankruptcy estate.  Additionally, the Debtor has suffered damages including corporate waste;

increased expenses, liabilities, and administrative costs; a decrease in value of the Debtor's assets; and a substantial diminution in the Debtor's enterprise value.

WHEREFORE, Plaintiff demands judgment against Mahoney, Kuhns, and Ake, jointly and severally, for compensatory damages, together with pre-judgment interest, court costs and for such other and further relief as this Court deems appropriate.  Plaintiff reserves the right to seek punitive damages at the appropriate time.

## COUNT II
## AIDING AND ABETTING
## BREACH OF FIDUCIARY DUTY
### *(Against Kuhns and Ake)*

82.     Plaintiff restates and realleges paragraphs 1 through 73 as if fully stated herein.

83.     With respect to Kuhns and Ake, this count is pled in the alternative to the relief sought in Count I.

84.     At all times relevant hereto, Mahoney was the CEO of the Debtor.

85.     As set forth above, Mahoney had fiduciary duties to the Debtor by virtue of his position as an officer of the Debtor, and Mahoney breached those duties.

86.     As alleged herein, Ake and Kuhns had actual knowledge of and rendered substantial assistance to the breaches of fiduciary duty committed by Mahoney, which proximately caused damage to the Debtor and its creditors, including among other things, causing Masten to:

   a.   Fail to properly plan for, oversee, or comprehend the scope of the work required by the MM1 Mission;

   b.   Refuse to invest in key positions resulting in inexperienced or underqualified employees in positions of significant authority;

   c.   Fail to plan for a trained and/or skilled workforce to operate and maintain the MM1 Mission;

    d.   Fail to negotiate realistic financial terms of the MM1 Mission, which would have allowed Masten to cover the expenses for and realize a profit on the project;

    e.   Fail to secure commercial payload contracts or investments to offset the loss of the MM1 Mission;

    f.   Fail to maintain its relationship with NASA as a result of Masten's excessive, unsupported, and unsubstantiated request for over $17 million in Covid relief funds;

    g.   Fail to focus efforts and resources singularly at the critical facility needs at the Mojave location;

    h.   Fail to implement an organizational structure or culture required by a company handling large government contracts;

    i.   Fail to keep itself apprised of concerns and allegations made by various employees and make changes necessary to alleviate such concerns; and

    j.   Continue to operate once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors.

87.    As a proximate result of Kuhns and Ake aiding and abetting Mahoney's breaches of fiduciary duties, the Debtor's creditors have tens of millions of dollars in unpaid claims against the Debtor's bankruptcy estate.  Additionally, the Debtor has suffered damages including corporate waste; increased expenses, liabilities, and administrative costs; a decrease in value of the Debtor's assets; and a substantial diminution in the Debtor's enterprise value.

WHEREFORE, Plaintiff demands judgment against Kuhns and Ake, jointly and severally, for compensatory damages, together with pre-judgment interest, court costs and for such other and further relief as this Court deems appropriate.  Plaintiff reserves the right to seek punitive damages at the appropriate time.

Dated: October 19, 2023

**PASHMAN STEIN WALDER HAYDEN, P.**C

 */s/ Henry J. Jaffe*
 Henry J. Jaffe (No. 2987)
 Joseph C. Barsalona II (No. 6102)
 1007 North Orange Street, 4th Floor, #183
 Wilmington, DE 19801
 Telephone: (302) 592-6497
 Facsimile: (201) 488-5556
 Email:  hjaffe@pashmanstein.com
         jbarsalona@pashmanstein.com

-and -

**BAST AMRON LLP**
Jeffrey P. Bast, Esq.
Dana R. Quick, Esq.
Hayley G. Harrison, Esq.
One SE Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastamron.com
Email: dquick@bastamron.com
Email: hharrison@bastamron.com

*Special Litigation Counsel to Peter Hurwitz, as*
*Liquidating Trustee of the Masten Space Systems,*
*Inc. Liquidating Trust*