## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>SPACE CASE (f/k/a Masten Space Systems, Inc.),<br>　　　　　　Debtor | Chapter 11<br><br>Case No. 22-10657 (BLS) |
| PETER HURWITZ, as Liquidating Trustee of the MASTEN SPACE SYSTEMS, INC. LIQUIDATING TRUST,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>SEAN MAHONEY, individually; MATTHEW KUHNS, individually; and COLIN AKE, individually,<br><br>　　　　　　Defendants. | Adv. Pro. No. 23-50748 (BLS)<br><br>(Re: Adv. D.I. 20, 22, 23, 24, 26, 27, 28) |

## OPINION GRANTING DEFENDANTS'
## MOTIONS TO DISMISS  COMPLAINT[1]

Masten Space Systems, Inc. (the "Debtor" or "Masten") filed a voluntary

chapter 11 bankruptcy petition before this Court on July 28, 2022.  The Court

confirmed the Debtor's Chapter 11 Plan of Liquidation on November 9, 2022.[2]  The

---

[1] This Court has jurisdiction to decide the Motion to Dismiss pursuant to 28 U.S.C. § 157 and § 1334(b). Pursuant to Fed.R.Civ.P. 52 (made applicable here through Fed. R. Bankr. P. 7052), the Court does not make findings of fact when deciding a motion to dismiss under Fed. R. Civ. P. 12(b).

[2] Main Case Docket No. 226.  *See* Docket No. 226-1 (the "Plan").

Plan established the Liquidation Trust and appointed Peter Hurwitz as Liquidating Trustee (the "Trustee" or "Plaintiff").

The Trustee commenced this adversary proceeding by filing a Complaint for Breach of Fiduciary Duty (the "Complaint") against three of the Debtor's officers: Sean Mahoney, Matthew Kuhns, and Colin Ake (the "Officers" or the "Defendants").[3]  Defendant Sean Mahoney ("Mahoney") filed a motion to dismiss the Trustee's Complaint on December 18, 2023.[4]  On the same date, Defendants Matthew Kuhns and Colin Ake filed a joint motion to dismiss the Complaint.[5]  The Trustee has filed separate memoranda of law in opposition to each motion to dismiss the Complaint.[6]  All three Defendants jointly filed a reply brief in further support of the motions to dismiss the Complaint.[7]  The Court heard oral argument on the motions to dismiss and took the matters under advisement.

The Complaint describes the travails of a rocket company that was selected as a winning bidder on a NASA contract to build a spacecraft and deliver science and technology instruments to the moon.  It is undisputed that the Debtor failed to complete its mission.  The Complaint alleges that the Officers so egregiously mismanaged the project that they breached their fiduciary duties to the company and caused tremendous harm to the company and its creditors in the process.  The Complaint does not allege that the Officers engaged in any self-interested or

---

[3] The Complaint contains two counts:  Count I for Breach of Fiduciary Duty against all three defendants and Count II for Aiding and Abetting Breach of Fiduciary Duty against Defendants Kuhns and Ake.
[4] Adv. Docket Nos. 20, 22 (the "Mahoney Motion to Dismiss").
[5] Adv. Docket Nos. 23, 24 (the "Kuhns-Ake Motion to Dismiss").
[6] Adv. Docket Nos. 26, 27.
[7] Adv. Docket No. 28.

conflicted transactions that would support a claim for a breach of the duty of loyalty.[8]  The substance of the Complaint alleges that the Officers breached only their duty of care or the duty of good faith.  The Defendants move to dismiss the Complaint, arguing that it fails to assert facts to support a breach of fiduciary duty claim.  In particular, the Defendants contend the alleged facts fail to demonstrate that the Officers were grossly negligent or acted in bad faith. Further, the Defendants assert that the Complaint fails to "plead around" the applicable presumption of the business judgment rule.

For the reasons set forth herein, the Court agrees with the Defendants and will grant each of the Motions to Dismiss.

<u>FACTUAL ALLEGATIONS</u>

The Debtor was founded in 2004 with the purpose of reducing the barriers to space by making rockets and spacecraft more cost effective through the use of reusable technologies, autonomous systems, and small operational teams.[9]  At all relevant times, the Defendants held themselves out to be officers of Masten, although the positions were not formalized until 2017 for Mahoney and 2021 for Kuhns and Ake when Masten's Board resolved by unanimous consent to officially appoint them as officers of the company.[10]  Pursuant to the 2021 unanimous consent, Mahoney, as CEO, had general supervision, direction and control of the

---

[8] As discussed *infra*, the duty of good faith is a subsidiary element of the duty of loyalty.  *See n.* 90. So, if the Complaint sufficiently alleges a breach of the duty of good faith, the duty of loyalty is implicated.

[9] Compl. ¶ 18.

[10] Compl. ¶ 20.

business and affairs of Masten.[11]  Rather than fostering an environment of collaboration and teamwork, the Complaint alleges that Mahoney created an unstable work environment that lacked organizational structure, fostered uncertainty, and sidelined employees, some of whom feared retaliation when they voiced concerns.[12]

For most of its existence, Masten was a small company with fewer than 25 employees.[13]  Masten primarily funded its operations using the revenue generated from government and commercial contracts, and investments from a small group of investors.[14]

In 2019, after working for years with NASA on a number of smaller contracts, Masten was awarded commercial lunar payload services ("CLPS") provider status by NASA (which is granted only to companies that have met certain criteria to be pre-qualified to bid on specific projects).[15]  As a result of the CLPS status, Masten had its first opportunity to bid for a significant NASA project that would span several years and bring the company to the forefront of the industry.[16] Through this project, NASA requested to have eight payloads of science and technology instruments delivered to the Lunar South Pole with a soft landing on or before December 31, 2022 (the "MM1 Mission").[17]

---

[11] Compl. ¶ 21.
[12] Compl. ¶ 23.
[13] Compl. ¶ 24.
[14] Compl. ¶ 26.
[15] Compl. ¶ 28.
[16] Compl. ¶ 29.
[17] *Id.*

Masten submitted a bid of $79.5 million for the MM1 Mission.[18]  The Complaint alleges that Masten's bid was far less than bids submitted by its competitors, and far less than the actual costs necessary to meet the project's requirements, but that the Defendants justified the bid with the "unsupported assumption" that Masten would secure private commercial payloads to defray the project's costs.[19]  However, the Complaint asserts that Masten had no binding commitments or any potential payload commercial customers at the time the bid was made.[20]

Masten was a winning bidder for the MM1 Mission, but the Complaint alleges that, at that time, Masten had neither the appropriate facilities nor capable employees needed to build the required spacecraft.[21]  The Defendants knew they would have to quickly scale up Masten's workforce and facilities, but the Complaint claims the Defendants failed to formulate a realistic plan to do so.[22]

At the time of the award in April 2020, the Debtor occupied just a few buildings at Mojave Air and Space Port that lacked the facilities needed to fulfill the project obligations.[23]  Specifically, the Complaint alleges that Masten had no clean room facilities and no facilities either for supporting space mission operations or for assembling a spacecraft.[24]

---

[18] Compl. ¶ 30.
[19] *Id.*
[20] Compl. ¶ 31.
[21] Compl. ¶ 32.
[22] Compl. ¶ 43.
[23] Compl. ¶ 42.
[24] *Id.*

The Complaint alleges that Masten should have been able to secure the needed investments to cover the anticipated growth (as its competitors in the aerospace industry were doing at the time), but Masten was unable to obtain investments in part because it lacked reliable financial information.[25]  The Complaint asserts that it had no projections, disorganized financials, and no investor deck that would have been needed to secure such investments.[26]  Instead, at year end 2020, just months after the MM1 Mission was awarded, Masten was operating at an $11 million loss, $9 million of which was directly related to the MM1 Mission, even though Masten had projected that the mission would provide 80% of Masten's revenues in 2020 and 2021.[27]

The Complaint asserts that the Defendants knew how important the MM1 Mission's timeline was to NASA; however, by March 2021 (one year into the mission), Masten was so far behind schedule that it requested a one-year extension of the deadline to complete the mission.[28]  Despite obtaining the extension, the Complaint alleges that the Defendants made no plan to cover an extra year of expenses and no plan to complete the MM1 Mission's objectives.[29] Instead, the Complaint asserts that the Defendants continued working on the MM1 Mission even though it was driving Masten further into insolvency and causing Masten to lose other opportunities.[30]

---

[25] Compl. ¶ 34.
[26] *Id.*
[27] Compl. ¶ 35.
[28] Compl. ¶37
[29] Compl. ¶¶ 38, 39.
[30] Compl. ¶ 40.

The Complaint alleges that Masten needed the Defendants to focus on improving the company's staffing and operating facilities in Mojave to meet the needs of the mission.[31]  However, rather than addressing these critical needs, the Complaint claims that Mahoney and Ake focused on expanding office space in Atlanta (with a lease budgeted at $75 - $135,000 annually) for a small engineering team that was already mostly working remotely.[32]  The Complaint also alleges that the Atlanta office diverted Mahoney's attention away significant issues raised by engineers on site at Mojave about building the necessary clean room there.[33]

In a July 2021 presentation to Masten's Board on the status of the MM1 Mission, Kuhns and Ake acknowledged the problems caused by staffing shortages, which were driven by low salaries, a need for high competency levels, and relocation to Mojave.[34] By August 2021, Masten's CFO advised Mahoney that the company was six months away from running out of cash and needed to implement a hiring freeze until more capital could be raised.[35]  By December 2021, Masten had to implement a spending freeze, as it ran out of cash.[36]  Then, Masten failed to make timely payments to various venders, including a $1.7 million progress payment to Agile Space Industries due November 14, 2021, and a $4.6 million installment payment due to SpaceX due on December 1, 2021.[37]  Although Masten blamed its missing payments on a delay of payment from NASA, the Complaint alleges that

---

[31] Compl. ¶ 50.
[32] Compl. ¶ 52.
[33] Compl. ¶¶ 51-52.
[34] Compl. ¶48.
[35] Compl. ¶49.
[36] Compl. ¶ 54.
[37] Compl. ¶ 55.

the NASA payment delay was due to Masten's failure to make timely milestone deliveries on the mission.[38]  The Complaint claims vendors contributing to the MM1 Mission began pulling out of the project, leaving Masten with few options to salvage revenue from the contract.[39]

The Complaint alleges that, despite the deficiencies, NASA continued to work with Masten.  To address potential shortfalls directly related to the Covid-19 pandemic (and related delays and supply chain issues), NASA invited Masten to apply for Covid relief funds.[40]  The Complaint claims that Masten employees with knowledge of both the MM1 Mission and NASA's expectations cautioned Mahoney to request no more than $1-1.3 million, asserting that exceeding that range would risk denial and delay funding that was desperately needed to pay crucial suppliers at year end.[41]  The Complaint alleges that Mahoney ignored that advice and submitted an "excessive, unreasonable, and unsubstantiated" request for $17.4 million in relief funds, which NASA denied the same day.[42]  The Complaint asserts that this decision caused material defaults with critical vendors and caused NASA to lose confidence in Mahoney and his ability to complete the MM1 Mission and future projects.[43]  The Complaint claims NASA representatives specifically requested that Mahoney be removed from future communications with NASA.[44] Although Masten later resubmitted and was granted Covid funding of just under $1

---

[38] *Id.*
[39] Compl. ¶ 56.
[40] Compl. ¶¶ 58-59.
[41] Compl. ¶¶ 60-61.
[42] Compl. ¶¶ 62, 65.
[43] Compl. ¶¶ 63-64.
[44] Compl. ¶ 64.

million in early 2022, the Complaint alleges that, by then, Masten had already

irreparably damaged its relationship with vendors and NASA.[45]

The Complaint alleges that much of Masten's dire financial situation resulted

from Mahoney's "actions and inactions," including the following:

- Mahoney's insistence on "informal" structure, including lack of an organizational chart or defined roles that fostered uncertainty and lack of oversight,[46] and caused confusion regarding company hierarchy, chain of reporting, and general duties and job functions;[47]

- Mahoney's refusal to invest in critical positions, leaving inexperienced or underqualified employees in positions of authority;[48]

- Mahoney's use of a strategy dubbed the "bacon cheeseburger approach" which meant coming up with bare minimum solutions to systematic problems that did not address the actual cause of the problem;[49]

- Mahoney's failure to: (i) devise meaningful plans to meet the MM1 Mission requirements, (ii) strategically and thoughtfully ramp up company expansion after award of the contract; (iii) fill the gaping financial hole in MM1 Mission funding; and (iv) actually plan for and send the required spacecraft to the moon;[50]

- Mahoney's failure to implement changes after formal complaints by employees, including a complaint for retaliation by an employee fired after alerting Mahoney and Ake to potential billing irregularities;[51]

- After insistence that he document human resource policies and an organizational chart, Mahoney created an organization chart in January 2022 that ignored advice by Masten's CFO and General Counsel that the company's use of independent contractors violated Department of Labor rules.[52]

---

[45] Compl. ¶ 65.
[46] Compl. ¶ 66.
[47] Compl. ¶ 69.
[48] Compl. ¶ 67.
[49] Compl. ¶ 68.
[50] Compl. ¶ 68.
[51] Compl. ¶70.
[52] Compl. ¶¶ 71, 72.

In April 2022, the Board formally removed Mahoney as CEO.[53]  The company filed for bankruptcy three months later.

## LEGAL STANDARD

When reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), made applicable hereto by Fed.R.Bankr.P. 7012, the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[54]  In *Twombly*, the Supreme Court instructed that a pleading must nudge claims "across the line from conceivable to plausible."[55] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[56]  To make these determinations, the court will draw upon "its judicial experience and common sense."[57]

The Third Circuit follows a three-step process to determine the sufficiency of a complaint:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[58]

---

[53] Compl. ¶ 73.

[54] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).

[55] *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[56] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[57] *Theseus Strategy Group LLC v. Barsa (In re Old BPSUSH, Inc.)*, 2021 WL 4453595, *14 (D. Del. Sept. 29, 2021) (citing *Iqbal*, 556 U.S. at 679-80).

[58] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

The movant carries the burden of showing that the dismissal is appropriate.[59]

DISCUSSION

As noted above, the Complaint only brings claims against former officers of

the Debtor.[60] Count I of the Complaint alleges that the Defendants, as officers of

Masten, owed Masten and its creditors fiduciary duties and breached those duties

through their acts and omissions described in the Complaint.  The Defendants

argue that the Complaint is factually insufficient to support the breach of fiduciary

duty claims, including a failure to allege facts that will overcome the presumption of

the business judgment rule.

### 1. Fiduciary Duties

Under Delaware law, officers and directors owe the corporation a triad of

fiduciary duties:  the duty of care, the duty of loyalty, and the duty to act in good

faith.[61]  A complaint states a claim against an officer or director for breach of

fiduciary duty when it alleges facts demonstrating that (1) the defendant took part

in the challenged conduct, and (2) the defendant failed to demonstrate the due care

attendant to his particular office in doing so.[62]

---

[59] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

[60] The record reflects that all of the members of Masten's Board of Directors received broad releases from liability under the terms of Masten's confirmed plan.  Presumably, the Defendants were not in the room where the plan was negotiated.  *Cf.* Miranda, Lin-Manuel, *The Room Where It Happened*, *on* HAMILTON: AN AMERICAN MUSICAL (Atlantic Records, 2015).

[61] *Off'l Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)). The fiduciary duties of officers are the same as those of directors.  *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).

[62] *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 573 (Bankr. D. Del. 2008).  *See also In re Our Alchemy, LLC*, 2019 WL 4447541, *10 (Bankr. D. Del. Sept. 16, 2019) ("To state a plausible claim for breach of fiduciary duty, the plaintiff should

(a) <u>The Business Judgment Rule</u>

The business judgment rule is Delaware's default standard of review for evaluating breach of fiduciary duty claims.[63]  It is not a substantive rule of law; instead, the business judgment rule is a presumption that, when making a business decision, the corporation's officers and directors acted on an informed basis and in the honest belief that the action taken was in the best interests of the company.[64] The presumption applies when there is no evidence of fraud, bad faith, or self-dealing.[65]  "Under the business judgment rule, a court will not second-guess the fiduciary's decision as long as it has any rational business purpose, even if the decision ends up being flawed in hindsight."[66]

The Trustee in this case argues that the business judgment rule is an affirmative defense that should not be considered on a motion to dismiss. Generally, the applicability of an affirmative defense cannot be determined on a motion to dismiss, but "[a] complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face."[67]  Thus, the Third Circuit Court of Appeals has determined that a complaint challenging a business decision must plead around the business judgment rule by alleging facts that rebut the presumption.[68] A plaintiff may overcome the presumption that directors and officers

---

allege specific conduct by each individual officer or director in authorizing the challenged transaction.").

[63] *Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC)*, 551 B.R. 749, 761 (D. Del. 2016) *aff'd* 682 Fed. App'x 125 (3d Cir. 2017).

[64] *Id.* (citing *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005)).

[65] *Id.* (citing *Walt Disney*, 907 A.2d at 747)).

[66] *Ultimate Escapes*, 551 B.R. at 761.

[67] *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005).

[68] *Id.  See also Ultimate Escapes*, 551 B.R. at 761.

acted in good faith by alleging that a decision is so far beyond the bounds of reasonable business judgment that its only explanation is bad faith.[69] "Alternatively, a plaintiff may overcome the presumption that directors and officers acted on an informed basis by establishing that a decision was the product of an irrational process or that directors failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's legal compliance and business performance, resulting in liability."[70]

If the plaintiff succeeds in rebutting the business judgment presumption, the burden shifts to the defendants to prove by a preponderance of the evidence that the challenged transaction was "entirely fair" to the corporation and its shareholders.[71] With the presumption of the business judgment rule in mind, the Court will examine the Complaint's breach of fiduciary duty claims to determine if the business judgment rule is rebutted.

(b) The Duty of Care

"The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) use that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances; and (2) consider all material

---

[69] *Tower Air*, 416 F.3d at 238 (citing *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999)). The court also phrased the task of overcoming the presumption of good faith as: "The burden here is to show irrationality:  a plaintiff must demonstrate that no reasonable businessperson could possibly authorize the action in good faith."  *Id.*

[70] *Tower Air*, 416 F.3d at 238 (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967-70 (Del. Ch. 1996)).

[71] *Ultimate Escapes*, 551 B.R. at 761.

information reasonably available."[72]  Further, "under Delaware law, a plaintiff cannot 'prove a breach of the duty of care without a showing of gross negligence.'"[73]  "To establish gross negligence, 'a plaintiff must plead ... that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason.'"[74] "The exact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner."[75]

The Complaint asserts that the Defendants breached their fiduciary duties owed to the Debtor and its creditors as follows:

1. Failing to properly plan for, oversee, or comprehend the scope of work required for the MM1 Mission;
2. Refusing to invest in key positions resulting in inexperienced or underqualified employees in positions of authority;
3.  Failing to plan for a trained and/or skilled workforce to operate and maintain the MM1 Mission;
4. Failing to focus efforts and resources singularly at the critical facility needs at the Mojave location;
5. Failing to negotiate realistic financial terms of the MM1 Mission which would have allowed Masten to cover the expenses for and realize a profit on the project;
6. Failing to secure commercial payload contracts or investments to offset the loss of the MM1 Mission;
7. Failing to heed advice when submitting a request for over $17 million in Covid relief funds from NASA, causing unnecessary delays in critical funds and irreparably harming the relationship between Masten and NASA;

---

[72] *Bridgeport Holdings*, 388 B.R. at 568 (quoting *Walt Disney*, 907 A.2d at 749).
[73] *Liquidation Trust of Solutions Liquidation LLC v. Stienes (In re Solutions Liquidation LLC)*, 608 B.R. 384, 397–98 (Bankr. D. Del. 2019)(quoting *Fedders N. Am.*, 405 B.R. at 539).
[74] *Solutions Liquidation*, 608 B.R. at 398 (quoting *A&J Capital, Inc. v. Law Office of Krug*, 2019 WL 367176 at *12 (Del. Ch. Jan. 29, 2019), *judgment entered sub nom Capital, Inc. v. Law Office of Krug*, 2019 WL 499352 (Del. Ch. 2019) *aff'd* 222 A.3d 143 (Del. Nov. 1, 2019)).
[75] *Fedders N. Am.*, 405 B.R. at 539.

14

8. Failing to implement an organizational structure or culture required by a company handling large government contracts;

9. Failing to keep themselves apprised of concerns and allegations made by various employees and make changes necessary to alleviate such concerns; and

10. Continuing to operate the Debtor once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors.[76]

The Trustee argues that the Complaint adequately alleges the Officers' failure to conduct appropriate due diligence to ensure Masten had the resources, employees, and infrastructure to complete the MM1 Mission. The Trustee claims that the Officers' failure to plan, evaluate, and then re-evaluate for the Mission is gross negligence and a complete abdication of the Defendants' fiduciary duties.

The Defendants argue in response that the Complaint attempts to target the Officers with breach of fiduciary duty claims simply because certain business risks undertaken by Masten did not, in hindsight, work out for the company. The Defendants contend that many of the Complaint's allegations are really criticisms of business judgments made by the Officers while performing their duties.

The Defendants claim that Complaint's logic is confusing. For example, they note that the Complaint acknowledges the MM1 Mission was the largest program in Masten's history, but then alleges the Officers should have known the company lacked the organizational and physical infrastructure to support the MM1 Mission.[77] The Defendants observe that it would have been wasteful for Masten to spend money and resources on the infrastructure *prior* to winning the contract, as

---

[76] Compl. ¶ 79.
[77] Compl. ¶ 41.

the Complaint seems to suggest.  Also, the Complaint admits that the Masten grew from only 25 employees in 2020 (pre-bid award) to over 104 employees in 2022.[78] The Complaint faults Masten for operating without a formal organizational structure, but the Defendants argue this merely criticizes the Officers' decisions as they adapted to the expansion. Further, the Complaint alleges that the Officers failed to secure contracts for private customer payloads to support the cost of the MM1 Mission.[79]  The Defendants respond, however, that the Complaint does not allege that the Officers failed to make any efforts to secure such contracts, only that the "commercial contracts did not come to fruition."[80]  The Defendants argue that this distinction is important because simple business failures do not give rise to a breach of fiduciary duty.

The Complaint also faults Mahoney for "failing to heed advice" when submitting an "outlandish" request for $17.4 million in Covid relief funds (rather than seeking a more cautious $1-1.3 million request) at a time when "Masten desperately needed the money."[81]   The Defendants observe this shows Mahoney's request was made with the best interests of Masten in mind, even if it turned out to be an imperfect business decision, and resulted only in approximately a one-month delay to receive approved funds of just under $1 million.[82]

---

[78] Compl. ¶¶ 24-25.
[79] Compl. ¶¶ 30-31.
[80] Compl. ¶4.
[81] Compl. ¶¶ 59-64.
[82] Compl. ¶65.

Upon careful review and consideration of the Complaint, the Court agrees with the Defendants.  The facts alleged in the Complaint amount to nothing more than disagreement with the everyday operational decisions that officers are required to make while performing their duties. The Complaint faults business decisions on allocating resources between office leases and addressing "clean room" issues.  The Complaint recounts the reasons Masten had trouble employing qualified individuals (low salary ranges, a need for high competency levels and the relocation to Mojave) but does not allege that the Officers made no efforts to hire qualified employees. Allegations that the Officers mismanaged the project by extending deadlines and applying "bare minimum solutions" to systemic problems, while becoming more and more insolvent, is not enough to plead a claim for breach of fiduciary duty.  As noted by this court in *Fedders North America*:

> At bottom, Plaintiff takes issue with the wisdom of decisions of the insiders, viewed through the prism of [the company's] subsequent collapse.  As noted in *Trenwick*,[83] however, business failure is an ever-present risk.  The mere fact that a strategy turned out poorly is in itself insufficient to create an inference that the officers and directors who oversaw the strategy breached their fiduciaries duties.  *Trenwick*, 906 A.2d at 193. Even when a company is insolvent, its directors and officers may "take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red."  *Id.* at 74.  The fact that a firm is insolvent does not mean that the company's officers and directors "cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery." *Id.*[84]

---

[83] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006) *aff'd* 931 A.2d 438 (Del. 2007).
[84] *Fedders N. Am.*, 405 B.R. at 541.

"Officers' management of day-to-day matters does not make them guarantors of negative outcomes from imperfect business decisions."[85]  The *Trenwick* court further explained:

> [T]he mere fact of a business failure does not mean that a plaintiff can state claims against the directors, officers, and advisors on the scene just by pointing out that their business strategy did not pan out.  If simple failure gave raise to claims, the deterrent to healthy risk taking by businesses would undermine the wealth-creating potential of capitalist endeavors.  For that reason, our law defines causes of action that may be pled against business fiduciaries and advisors with care, in order to balance society's interest in promoting good-faith risk-taking and in preventing fiduciary misconduct.[86]

Here, the Complaint may demonstrate that the Officers' management of the MM1 Mission was unsuccessful.  But the allegations do not support grounds for concluding that the Defendants were "recklessly uninformed," or their actions were "outside the bounds of reason."  There is no reason to conclude the Defendants acted with gross negligence.  Despite the Trustee's efforts to frame the allegations with conclusory labels of unreasonableness or a failure to act, the facts alleged merely describe business decisions, some imperfect in hindsight, made by the Officers during a turbulent period of expansion.  The allegations are not sufficient to rebut the protections afforded by the business judgment presumption and the claim for the Officers' breach of the duty of care must fail.

(c)  <u>The Duty of Loyalty and the Duty to Act in Good Faith</u>

The duty of loyalty "mandates that the best interests of the corporation and its shareholders takes precedence over any interest possessed by a director, officer

---

[85] *Segway Inc. v. Cai*, 2023 WL 8643017, *5 (Del. Ch. Dec. 14, 2023).
[86] *Trenwick*, 906 A.2d at 218.

or controlling shareholder and not shared by the shareholders generally."[87]  "To state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs."[88]  The Complaint here does not allege that the Defendants engaged in any self-interested transactions where they would receive a personal financial benefit.[89]

However, the duty of loyalty is not limited to cases involving financial or cognizable fiduciary conflict of interest; it also encompasses cases when a fiduciary fails to act in good faith.[90]  "A lack of good faith is shown by alleging conduct motivated by a subjective bad intent, or conduct that is an 'intentional dereliction of duty or the conscious disregard for one's responsibilities.'"[91]  Examples of conduct that would establish a failure to act in good faith include those where (i) the fiduciary intentionally acts with a purpose other than that of advancing the bests interests of the corporation, (ii) the fiduciary acts with the intent to violate applicable positive law, or (iii) the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[92]  To plead

---

[87] *Fedders N. Am.*, 405 B.R. at 540 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[88] *Fedders N. Am.*, 405 B.R. at 540 (quoting *Joyce v. Cuccia*, 1997 WL 257448, *5 (Del. Ch. May 14, 1997)).

[89] *Bridgeport Holdings*, 388 B.R. at 563-64 (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[90] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). "The duty to act in good faith is a 'subsidiary element of the duty of loyalty.'" *Solutions Liquidation*, 608 B.R. at 401 (quoting *Fedders N. Am.*, 405 B.R. at 540).

[91] *Old BPSUSH*, 2021 WL 4453595, *11 (citing *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008)).

[92] *Stone*, 911 A.2d at 369 (quoting *Walt Disney*, 906 A.2d at 67).

bad faith, the plaintiff must plead that there is not one plausible, and legitimate, explanation for the conduct of the officers.[93]

A claim for failure to act in good faith must allege more than gross negligence.[94] In the previous section, the Court concluded that the Complaint's allegations fail to demonstrate gross negligence. Because the standard for proving bad faith is more difficult, it follows that the Complaint also fails to state a claim for a breach of the duty of good faith.

The Court concludes that the Complaint's allegations are a litany of complaints about the merits of the Officers' day-to-day operational decisions at Masten. The factual allegations do not demonstrate the Defendants' intention to disregard their duties to the corporation.[95] Nor are there allegations that rise to the level of subjective bad faith. "Oversight duties under Delaware law are not, however, designed to subject [fiduciaries] to personal liability for failure to predict the future and to properly evaluate business risk."[96] As stated above, the alleged facts describe business decisions, some of which were imperfect in hindsight, made by the Officers during a turbulent period of expansion. There is no dispute about the outcome: the MM1 Mission failed. Delaware courts, however, do not equate a

---

[93] *Theseus Strategy Gp., LLC v. Barsa (In re Old BPSUSH, Inc.)*, 2021 WL 4453595, *13 (D. Del. Sept. 9, 2021) (citing *In re Alloy, Inc.*, 2011 WL 4863716, *12 (Del. Ch. Oct. 13, 2011)).

[94] *McPadden*, 964 A.2d at 1274 (citing *Walt Disney*, 906 A.2d at 65) "[G]rossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith." *Id.*

[95] The Complaint contains one reference to the Officers' disregard of an employee's formal complaint of being fired after alerting the Officers to "potential billing irregularities." Compl. ¶ 70. There are no other facts indicating that there was a known pattern of billing irregularities or "red flags" that the Defendants willfully ignored. *See In re McDonald's Corp. Stockholder Derivative Litig.*, 289 A.3d 343, 377 (Del. Ch. 2023).

[96] *Segway Inc. v. Cai*, 2023 WL 8643017, *5 (Del. Ch. Dec. 14, 2023) (quoting *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009) (internal punctuation omitted)).

bad outcome with bad faith.[97]  The Complaint does not support claims against the Officers for breaching the duty of loyalty or the duty of good faith.

### 2. Aiding and Abetting Breach of Fiduciary Duty

Count II of the Complaint asserts a claim against Defendants Kuhns and Ake for aiding and abetting a breach of fiduciary duty.  Defendants Kuhns and Ake have moved to dismiss this claim on three grounds: (i)  if the breach of fiduciary duty claim fails, then there can be no claim for aiding and abetting a breach of fiduciary duty; (ii) if Kuhns and Ake are fiduciaries of Masten, then they cannot be held to aid and abet a separate breach of fiduciary duty against the same entity; and (iii) even if the claim for aiding and abetting the breach of fiduciary duty is possible, the Complaint lacks factual allegations to support such a claim.

To state a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must allege: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach.[98]  For the reasons set forth above, the breach of fiduciary duty claim fails, and so the second element of the aiding and abetting claim cannot be met.  "[B]ecause the breach of fiduciary duty claim is dismissed, the aiding and abetting claim must also be dismissed."[99]

---

[97] *Cai*, 2023 WL 8643017 at *5 (citing *Stone*, 911 A.2d at 373)).
[98] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, *17 (Del. Ch. June 30, 2014) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).
[99] *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, *8 (Del. Ch. July 23, 2010).

CONCLUSION

For the reasons set forth above, the Defendants' Motions to Dismiss the Complaint will be granted.  An appropriate Order will be entered.

FOR THE COURT:

Brendan Linehan Shannon
United States Bankruptcy Judge

Dated:  April 15, 2024